# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Magistrate Case No.: 19-00215 (GMH) |
| ) | |
| SADIE BACA, ) | |
| ) | |
| Defendant. ) | |

## DETENTION MEMORANDUM

This matter comes before the Court on a motion by the United States requesting that Defendant Sadie Baca ("Ms. Baca") be detained pending trial. Ms. Baca has been charged by Criminal Complaint with one count of Conspiracy to Commit Sex Trafficking by Force, Fraud, or Coercion, in violation of Title 18 United States Code Section 1594(c), and one count of Obstruction, in violation of Title 18 United States Code Section 1591(d). The undersigned held a preliminary hearing and a detention hearing on September 3, 2019, and concluded that Ms. Baca should be held without bond pending trial. This memorandum fulfills the Bail Reform Act's requirement that a pretrial detention order "include written findings of fact and a written statement of the reasons for the detention." 18 U.S.C. § 3142(i)(1); *see also United States v. Nwokoro*, 651 F.3d 108, 109 (D.C. Cir. 2011).

## Statutory Basis for Detention Hearing

Ms. Baca was brought before Magistrate Judge Deborah A. Robinson on August 19, 2019 for her initial appearance. At that time, the United States requested Ms. Baca's pretrial detention pursuant to two provisions of the Bail Reform Act. First, the United States requested that Ms. Baca be held temporarily pursuant to 18 U.S.C. § 3142(D)(1)(A)(iii), as the government asserted

Ms. Baca was on probation at the time of her initial appearance. Second, the United States requested that Ms. Baca be held pending trial pursuant to 18 U.S.C. § 3142(f)(1)(A), which allows the Court to hold a detention hearing in matters involving alleged crimes of violence. Ms. Baca did not dispute the United States' contention that these statutory provisions authorized the Court to hold a detention hearing in this matter.

## Findings of Fact

The United States proceeded at the preliminary hearing by calling Detective Jeremiah Johnson of the Metropolitan Police Department (MPD) as a witness. Detective Johnson has been employed by the MPD for ten years, and has been part of the Federal Bureau of Investigation (FBI) Child Exploitation and Human Trafficking Task Force (CEHTTF) for three years. Detective Johnson was the lead detective on the case against Ms. Baca and the man she allegedly worked with, Terrell Armstead, and had been investigating the case since May 2018. He was also the affiant on the Statement of Facts in support of the criminal complaint against Ms. Baca. Detective Johnson adopted that Statement of Facts as part of his testimony. Defense counsel cross-examined Detective Johnson after the conclusion of the government's direct examination. The undersigned considered Detective Johnson's testimony, the Statement of Facts he swore to, and the arguments by counsel for both parties, and determined there was probable cause to find that the charged offenses were committed, and that Ms. Baca committed them.

The Court held a detention hearing in this matter immediately following the preliminary hearing. Having considered the written Statement of Facts sworn to by Detective Johnson in support of the complaint as well as his testimony from the preliminary hearing, the information provided by the Pretrial Services Agency (ECF No. 5), and the Government's Memorandum in

Support of Pretrial Detention of Defendant Sadie Baca (ECF No. 8), the Court makes the following findings of fact.

The government alleges that Ms. Baca worked with an adult male, Mr. Armstead, to traffic an adult female, Witness 1, using force, fraud, or coercion. Mr. Armstead has also been charged with multiple offenses, including trafficking of minors. The government further alleges that Ms. Baca obstructed or interfered with—or attempted to do so—the investigation into and prosecution of Mr. Armstead, which is why she has been charged with Obstruction.

On May 10, 2018, the MPD/Federal Bureau of Investigation ("FBI") Child Exploitation and Human Trafficking Task Force ("CEHTTF") began conducting an online proactive investigation on social media into sex trafficking. While searching for known, coded terms for pimping and prostitution, a member of the CEHTTF discovered an Instagram account with the screen name "supreme_p16." This account contained pictures, videos, and comments that were consistent with the account owner acting as a pimp and running a prostitution business. The term "p16," which is contained in this account, is known to law enforcement to refer to a pimp. Other terms in the account indicative of commercial sex trafficking include "#rpgo," which stands for "real pimping going on," and "#rhgo," which stands for "real hoeing going on." Members of the CEHTTF were able to use law enforcement databases and Instagram records for this account to connect it with a phone number associated with Mr. Armstead.

On July 5, 2018, Mr. Armstead posted a video on the "supreme_p16" Instagram account in which he talked about being in downtown D.C. and how it was "choosing season."[1] In another Instagram video posted that day, Mr. Armstead is depicted sitting in his vehicle and

---

[1] The term "choosing season" is known to law enforcement as being a term for prostitutes choosing a new pimp.

displaying large amounts of U.S. currency. While displaying his money, Mr. Armstead stated, "Aint nothing except some pimping going on, you know what I'm saying." In addition, an image posted on June 21, 2018, bearing the caption "Who wants to join TeamSupreme," depicted a large amount of U.S. currency on a bed. Two answers were available to select: "Let's get this money" and "I like being broke." Pictures of Ms. Baca were prominent in those Instagram postings.

The CEHTTF obtained a search warrant for the "supreme_p16" Instagram account and recovered hundreds of messages in which Mr. Armstead sent direct messages to females attempting to recruit them into his commercial sex trafficking business. Witness 1 was recruited by Mr. Armstead in this way. Mr. Armstead explained to Witness 1 that he could be her pimp, take care of her, and that they could make a lot of money together. When law enforcement interviewed Witness 1 on November 14, 2018, she informed them that she traveled to Baltimore, Maryland to engage in commercial sex acts for Mr. Armstead.

After Witness 1 arrived in Baltimore, Ms. Baca and Mr. Armstead sent text messages to each other about her. Specifically, Mr. Armstead asked Ms. Baca whether she thought Witness 1 was "down for [Mr. Armstead]," to which Ms. Baca replied, "Yeah she's a really good bitch." Mr. Armstead then said "Ok" and told Ms. Baca to "Figure her out and give her tips on how I like things done." Ms. Baca and Mr. Armstead acknowledged to Witness 1 that they had "worked other girls," but that the two of them were together for the longest period of time. Witness 1 reported that Ms. Baca had been with Mr. Armstead for 5 years, and that she began engaging in commercial sex acts for Mr. Armstead when she was approximately 16 years old. Ms. Baca also told Witness 1 that she has wanted to leave Mr. Armstead, but that she had never

been able to. Mr. Armstead told Witness 1 that Ms. Baca was his partner and ranked as his "main girl."[2]

Witness 1 and Ms. Baca worked for Mr. Armstead as dancers in strip clubs in D.C., Baltimore, and New York, New York. While working in strip clubs, Witness 1 and Ms. Baca arranged commercial sex "dates" with customers. Witness 1 had to give all of her money to Mr. Armstead, or to Ms. Baca to hold for Mr. Armstead. Text messages between Ms. Baca and Mr. Armstead also revealed that Ms. Baca kept Mr. Armstead updated on how Witness 1 was performing in her work at the clubs or engaging in commercial sex acts. When a dispute arose regarding money Witness 1 had made, Mr. Armstead texted Ms. Baca saying: "U supposed to be me when I'm not around right?"

Ms. Baca also trained Witness 1 on the rules of working for Mr. Armstead in the commercial sex trade. According to Witness 1, Ms. Baca would sometimes accuse her of failing to follow Mr. Armstead's rules. In those instances, Ms. Baca would describe her as being "out of pocket," and make it clear that Witness 1 would have to be punished as a result. There was no tolerance for Ms. Baca not to report an infraction to Mr. Armstead. Furthermore, Witness 1 reported that Mr. Armstead had taken her social security card, identification card, and vehicle keys, and would not allow her to go anywhere alone. Witness 1 was also not allowed to visit her family who lived out of state, or to leave the residence unless she traveled with Ms. Baca. Mr. Armstead also bought Witness 1 a phone and could track her and Ms. Baca by GPS at all times.

---

[2] In the commercial sex industry, the term "bottom" is also used to describe a woman who assumes this role. The "main girl" or "bottom" is a partner in the business that has the authority of the trafficker when he is unavailable and acts as a lieutenant to carry out any orders the trafficker has issued. They are viewed to be the most loyal member of a commercial sex group.

Witness 1 said she felt in fear of Mr. Armstead if she did not make her quota or if she tried to leave.

According to Witness 1, Ms. Baca reinforced the value of loyalty to Mr. Armstead. Ms. Baca stressed that she was with Mr. Armstead as other women came and went because he was "the best," and that if Witness 1 was loyal, Witness 1 could have a great life and get everything she wanted. Ms. Baca made sure that Witness 1 followed the rules, and Ms. Baca never left Witness 1's side. Ms. Baca and Witness 1 slept in the same bed and went everywhere together. As a result, Witness 1 acknowledged that she and Ms. Baca grew close, but it was very clear that Ms. Baca's loyalty was to Mr. Armstead. Witness 1 described Ms. Baca as Mr. Armstead's "partner" and "right hand." Accordingly, Ms. Baca would report back to Mr. Armstead if Witness 1 violated any of Mr. Armstead's rules when he was not around. Witness 1 indicated that Ms. Baca reported violations to Mr. Armstead although she knew that Witness 1 would be punished.

Witness 1 initially told law enforcement that Mr. Armstead never physically assaulted or threatened her. However, in a subsequent interview on June 20, 2019, after Mr. Armstead had been arrested for sex trafficking and was in custody, Witness 1 revealed to law enforcement that on one occasion when Ms. Baca told Mr. Armstead that Witness 1 was "out of pocket," Mr. Armstead choked Witness 1 to the point she thought she would pass out. Witness 1 also indicated in a later interview that Mr. Armstead had held a gun to her head when he felt she was not following the rules. Witness 1 reported that Ms. Baca had also described being physically assaulted by Mr. Armstead, and Witness 1 had seen Mr. Armstead choke, smack, and throw Ms. Baca, and put a gun in Ms. Baca's mouth during sexual intercourse.

6

Witness 1 indicated that Mr. Armstead never went anywhere without a gun on his person. She also said Mr. Armstead's associates had guns and appeared to be involved in dangerous criminal activity. Witness 1 felt that the environment with Mr. Armstead was very unsafe, and that there was always a risk of being arrested or hurt. Witness 1 reported that Mr. Armstead had told her multiple times that he had shot someone and possibly murdered someone, although she never saw him shoot anyone. On one occasion, Witness 1 and Ms. Baca picked up firearms for Mr. Armstead from people who were later arrested for trafficking firearms.

On or around September 10, 2018, Witness 1 left Ms. Baca and Mr. Armstead. As she was preparing to leave, Mr. Armstead accused her of taking items she purchased while she was with him, and Ms. Baca went through Witness 1's belongings to ensure she did not take anything she was not supposed to. Ms. Baca also accused Witness 1 of leaving to go with another pimp. This, along with Mr. Armstead walking around with two firearms at the time, made Witness 1 afraid for her life. However, Witness 1 was able to leave.

On or about January 17, 2019, Ms. Baca was subpoenaed to appear before a grand jury regarding the case against Mr. Armstead. Before that, Mr. Armstead had been incarcerated for human trafficking charges in Montgomery County, Maryland, and for a felon in possession of a firearm indictment in D.C. Ms. Baca participated in a pre-charge interview on March 14, 2019, pursuant to a "use immunity" agreement she made with the government. She stated she had worked for Mr. Armstead as an escort, and that he had posted sexual solicitation advertisements of her online. Ms. Baca said there were many other girls who worked as escorts for Mr. Armstead during the time she has known him. She also said she and Mr. Armstead agreed that dancing in strip clubs would be a better option for her after he was arrested in Maryland. Ms. Baca stated she would meet clients for commercial sex acts at the strip clubs, and that she also

obtained clients on "the blade"[3] in D.C.  She said Mr. Armstead would go to "the blade" with her, and while she was engaging in commercial sex, Mr. Armstead was always somewhere nearby or with individuals he knew near "the blade."  Ms. Baca said the money she earned from escorting and dancing would be put into a safe that both she and Mr. Armstead could access.

      Mr. Armstead called Ms. Baca over 300 times from a recorded line at the Maryland jail while he was incarcerated.  Ms. Baca told Mr. Armstead when she was initially subpoenaed to appear before the grand jury, and he continued to ask her about why she had been subpoenaed and what she had told the prosecutors.  Mr. Armstead insisted on being updated on the status of Ms. Baca's contacts with the government, the dates of any meetings or grand jury appearances, and the information she was providing or was being asked to provide.  On March 24, 2019, on a recorded phone call, Ms. Baca informed Mr. Armstead of her upcoming meeting with the prosecutor, and he told her to: "Let them people know that I am not with no prostitution.  I never took nobody nowhere for no prostitution or nothing like that.  That I'm just your boyfriend."

      On March 25, 2019, Ms. Baca returned to the United States Attorney's Office pursuant to a subpoena, and advised that she did not wish to adopt her previous interview statement as testimony.  She said that when she provided that information she was stressed and was experiencing anxiety as a result of the interview.  She then provided a second statement that was inconsistent with evidence collected in the investigation.  That is, she stated that Mr. Armstead knew she was an escort but wanted her stop, and that he would drive her to the prostitution track in D.C., but that he thought she was going to meet friends and was unaware she was engaging in prostitution.  Ms. Baca also said that even in the previous case in Montgomery County, Maryland, where Mr. Armstead was arrested for human trafficking, he was just driving her to

---

[3] This is an area in D.C. known by law enforcement to have a lot of prostitution.

clients. Ms. Baca said she gave Mr. Armstead some of the money she earned from prostitution, but not because he forced her to. She advised that her activities did not involve anyone else except herself and her clients. Later that day, Mr. Armstead made a recorded telephone call to Ms. Baca, during which she stated: "I am going to refuse to testify and then I'm going to have to go to jail for a little while."

On May 3, 2019, Ms. Baca visited Mr. Armstead at the D.C. Jail and had a video-recorded conversation with him. Mr. Armstead discussed the charges that were brought against him and specifically talked about the "sex trafficking of minors" charge. Ms. Baca told him that she told prosecutors she did not remember if she was a minor when she started prostituting for Mr. Armstead. He later told her, "You got to be careful with the shit that you say. How many times to I got to tell you that?" He also told her "I need [you] to start using your thinking cap. Saying you don't remember was not cool." In response, Ms. Baca stayed quiet and cried. She did not deny working with Mr. Armstead at age 16.

While Mr. Armstead has been incarcerated, he has also called Ms. Baca to discuss the location of his firearms. For example, in one conversation, Ms. Baca asked Mr. Armstead how many firearms there should be, and in reference to one particular firearm she responded with "no, I have that." At one point, Ms. Baca also said she told someone that she likes to sleep with her gun under her bed.

## Legal Standard

"In our society, liberty is the norm and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). The Bail Reform Act of 1984, 18 U.S.C. § 3141, *et seq.*, articulates the circumstances that trigger that exception. Specifically, provisions of the Bail Reform Act authorize a judicial officer to order

the detention of a defendant before trial if the judicial officer determines after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e).

A finding that a defendant poses a danger to the community, or that there is a serious risk the defendant will flee, provides an adequate basis to order pretrial detention. *See Salerno*, 481 U.S. at 755; *United States v. Lee*, 195 F. Supp. 3d 120, 124 (D.D.C. 2016); *United States v. Henry*, 935 F. Supp. 24, 25 (D.D.C. 1996). A detention decision based upon the defendant's dangerousness to the community must be supported by "clear and convincing evidence." 18 U.S.C. § 3142(f); *see United States v. Smith*, 79 F.3d 1208, 1209 (D.C. Cir. 1996). In contrast, a detention decision based upon a finding that no set of conditions will reasonably assure the defendant's appearance in court "need only be supported by a 'preponderance of the evidence.'" *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987) (quoting *United States v. Vortis*, 785 F.2d 327, 329 (D.C. Cir. 1986)); *see United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996); *United States v. Anderson*, 382 F. Supp. 2d 13, 14 (D.D.C. 2005).

The Bail Reform Act directs judges to consider four factors in determining whether any conditions of release will reasonably assure a defendant's future presence in court or assure the safety of any other person and the community: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger to any person or to the community posed by the defendant's release. *See* 18 U.S.C. § 3142(g); *Xulam*, 84 F.3d at 442.

When there is probable cause to believe a defendant committed certain enumerated offenses, a rebuttable presumption provides "that no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of the

community." 18 U.S.C. § 3142(e)(3).  The basis for the presumption is "Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." *United States v. Hunt*, 240 F. Supp. 3d 128, 132 (D.D.C. 2017) (citing *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010)).  Once triggered, "the presumption operate[s] *at a minimum* to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985) (emphasis in original).  Specifically, the "defendant should 'present all the special features of [her] case' that take it "'outside the congressional paradigm.'" *Hunt*, 240 F. Supp. 3d at 132 (citing *Stone*, 608 F.3d at 946).  Furthermore, "even if the defendant offers evidence to counter the presumption, the presumption does not disappear entirely." *Id.*  Instead, the "presumption is incorporated into the other factors considered by [the] Court in determining whether to grant a conditional release and is given substantial weight." *United States v. Cherry*, 221 F. Supp. 3d 26, 32 (D.D.C. 2016) (quoting *United States v. Ali*, 793 F. Supp. 2d 386, 391 (D.D.C. 2011)); *see also United States v. Hite*, 76 F. Supp. 3d 33, 42-43 (D.D.C. 2014) (detaining the defendant although the defendant had presented enough evidence to rebut a presumption of detention).

## Discussion

The United States sought Ms. Baca's pretrial detention pursuant to 18 U.S.C. § 3142(f)(1)(A), because she is charged with a crime of violence.  The government did not argue that Ms. Baca presents a flight risk, thus the undersigned did not make any findings on that basis.

Both charges against Ms. Baca trigger the presumption of detention if the Court finds probable cause that she committed the offenses.  18 U.S.C. § 3142(e)(3)(D).  As noted above, the Court conducted a preliminary hearing and determined the record established probable cause that the Ms. Baca committed the charged offenses; therefore the rebuttable presumption was

triggered for each charge. After considering the rebuttable presumptions of detention and weighing the statutory factors, the Court concluded that Ms. Baca presented evidence sufficient to overcome the presumption of detention as to the trafficking charge, had not rebutted the presumption of detention as to the obstruction charge, and that there are no release conditions that would reasonably assure the safety of the community if she were released. Therefore, pretrial detention is appropriate, and the Court ordered Ms. Baca held without bond.

### A. Rebuttable Presumption of Detention

The undersigned finds that Ms. Baca overcame the presumption of detention as to the charge of Conspiracy to Commit Sex Trafficking by Force, Fraud, or Coercion, in violation of 18 U.S.C. § 1594(c), because she presented evidence that she was a victim of human trafficking. Ms. Baca proffered that she was the victim of brutal sexual abuse as a child, and that she later became involved in human trafficking when her abuser was released from custody. Evidence also suggests that Mr. Armstead trafficked Ms. Baca for the purposes of commercial sex while she was a minor. Ms. Baca proffered during the preliminary hearing and detention hearing that she was a victim of Mr. Armstead, that she was coerced by him or acted under duress, and that duress and coercion are defenses to any criminal charge. Indeed, the government's proffer included evidence (through Witness 1's testimony) that Mr. Armstead had physically assaulted and threatened Ms. Baca. Ms. Baca also asserted that Mr. Armstead was armed and had threatened at least two people. Additionally, the government has no evidence showing that Ms. Baca continued to engage in human trafficking after Mr. Armstead was detained. The evidence indicating that Ms. Baca was herself trafficked and engaged in the alleged misconduct as a result of duress or coercion, and the lack of evidence showing that she engaged in this conduct after Mr. Armstead was detained, overcomes the presumption of detention as to the trafficking charge.

On the other hand, Ms. Baca has not overcome the presumption of detention for the charge of Obstruction, in violation of 18 U.S.C. § 1591(d).  This charge stems from the contradictory accounts Ms. Baca provided to law enforcement describing her involvement with Mr. Armstead, and his role in alleged human trafficking and trafficking of minors.  Mr. Armstead called Ms. Baca hundreds of times since he was detained, and insisted on being updated regarding Ms. Baca's involvement in the investigation into him.  After Mr. Armstead told Ms. Baca to deny that he was involved in prostitution, Ms. Baca recanted her original testimony and told law enforcement that Mr. Armstead wanted her to stop being an escort and did not know that she was a prostitute.  Notably, this alleged obstruction took place after Mr. Armstead was detained.  In addition, Ms. Baca proffered that she is still in danger from Mr. Armstead's associates who are not detained, but the court finds this evidence insufficient to overcome the presumption of detention as to this charge where there is such strong evidence that Ms. Baca continued to interact with Mr. Armstead and do his bidding—to include moving firearms for him—after he was detained.  For these reasons, Ms. Baca has not rebutted the presumption as to the obstruction charge.

### B. The Nature and Circumstances of the Offense Charged

Ms. Baca is charged with serious offenses, and as a result, she faces a significant amount of exposure to incarceration.  These high potential penalties, as well as the presumption of detention, indicate how seriously Congress views these types of crimes.  Ms. Baca allegedly worked with Mr. Armstead to traffic Witness 1 for the purpose of commercial sex, and Witness 1 informed law enforcement that Ms. Baca told her that Ms. Baca and Mr. Armstead had previously trafficked other women.  This suggests the human trafficking offenses charged in this matter are part of a pattern of long-term, ongoing illegal sex trafficking.

The evidence that Witness 1 provided to law enforcement suggests that Mr. Armstead trusted Ms. Baca to do his bidding. This undermines the arguments that Ms. Baca was acting under duress or coercion, and makes the nature of her involvement in the alleged conspiracy more severe. Specifically, Witness 1 told law enforcement that Ms. Baca taught her the rules to follow, would report violations to Mr. Armstead, and also accused Witness 1 of leaving to work for another pimp while Mr. Armstead was nearby and carrying two firearms. Additionally, Witness 1 said she was not allowed to leave the residence unless Ms. Baca went with her. Lastly, Witness 1 also said Ms. Baca seemed like Mr. Armstead's "partner" and "right hand," and Mr. Armstead told Witness 1 that Ms. Baca was his "main girl." According to Detective Johnson, in the commercial sex industry, a "main girl" is someone who has the trafficker's authority when he is not around.

Other evidence further indicates that Ms. Baca was acting more as Mr. Armstead's partner than his victim. For example, when Ms. Baca allegedly texted Mr. Armstead asking whether she should hold onto Witness 1's money, he responded with: "Of course." Additionally, the text messages between Mr. Armstead and Ms. Baca discussing Witness 1 shortly after she arrived in Baltimore suggest a partnership, as Mr. Armstead apparently relied on Ms. Baca to help determine whether they should work with Witness 1. Mr. Armstead also texted Ms. Baca a message stating: "U supposed to be me when I'm not around right?," which suggests Ms. Baca was trusted by him to fill his role if he was not present. Finally, Ms. Baca allegedly told Witness 1 that she and Mr. Armstead had worked with other women, but that she had worked with him the longest. This suggests other women, including Witness 1, had left Mr. Armstead's employ, thereby undermining Ms. Baca's suggestion that she was unable to leave Mr. Armstead.

In support of her request for release, Ms. Baca argued that she is not charged with a violent crime. The undersigned does not find this argument compelling. Ms. Baca allegedly used coercion or other threatening behavior to control Witness 1 for the purposes of having her engage in Mr. Armstead's and Ms. Baca's commercial sex enterprise. It is true that Mr. Armstead is the one who allegedly took Witness 1's keys and identification cards and physically assaulted her or threatened her; however, Ms. Baca made it clear to Witness 1 that she would report purported rules violations to Mr. Armstead. Thus, although Ms. Baca may not have directly administered violence to Witness 1, she promoted it. Additionally, evidence suggests that Ms. Baca helped transport and hide firearms for Mr. Armstead and slept with a firearm under her bed. This is sufficient to show that she conspired to use coercion and force to control Witness 1, thus making this a violent offense for the purposes of evaluating the seriousness of this charge. For all of these reasons, this factor weighs in favor of pretrial detention.

### C. The Weight of the Evidence

There is a significant amount of evidence against Ms. Baca for both charges, although the obstruction charge is stronger as there is less evidence supporting a duress or coercion defense. Because the evidence against Ms. Baca is strong, this factor favors pretrial detention.

As to the human trafficking charge, the government has Witness 1's detailed statements regarding Ms. Baca's role in the commercial sex enterprise. These statements are also corroborated by text messages between Ms. Baca and Mr. Armstead that law enforcement recovered during the investigation. However, there is also evidence suggesting that Ms. Baca was coerced by Mr. Armstead to engage in the commercial sex enterprise, or that she was acting under duress. Specifically, Witness 1 told law enforcement she had seen Mr. Armstead physically assault Ms. Baca and put a firearm in her mouth. Additionally, evidence shows that

Ms. Baca may have begun working for Mr. Armstead when she was a minor and after she had been sexually assaulted as a child. These factors indicate Mr. Armstead may have taken advantage of Ms. Baca's vulnerability, and then groomed her to become his partner in the commercial sex enterprise. This would suggest that her involvement was not fully voluntary. Despite the evidence supporting a duress or coercion defense, there is still sufficient evidence to support Ms. Baca's pretrial detention.

The evidence in support of the obstruction charge is even stronger. The government interviewed Ms. Baca multiple times, and she provided contradictory evidence in these interviews. The government also recovered recorded conversations between Mr. Armstead and Ms. Baca that occurred while he was in jail that show she was attempting to influence the investigation into Mr. Armstead at his request. Although Ms. Baca asserted that she is still in danger from Mr. Armstead's associates even while he is incarcerated, this proffer does not support a coercion or duress defense nearly as strongly because Mr. Armstead was in custody when Ms. Baca allegedly tried to obstruct the investigation.

### D. Ms. Baca's History and Characteristics

Ms. Baca's history and characteristics are neutral. Ms. Baca is young and has a minimal criminal history. She also has family support, and would be able to reside with her mother, sister, and niece, all of whom were present during the detention hearing. Additionally, Ms. Baca proffered that she was abused as a child and was trafficked by Mr. Armstead for commercial sex when she was a minor. This abuse can be seen as a negative attribute, as Ms. Baca has been charged with perpetuating this abuse on other victims after she attained the age of majority. Nonetheless, Ms. Baca's history suggests that her actions may not have been fully voluntary.

Ms. Baca also has multiple negative attributes in her history and characteristics. Ms. Baca was convicted of Prostitution in 2018, and has been noncompliant with her release conditions by continuing to communicate with Mr. Armstead. She also allegedly failed to participate in a program to help victims of sex trafficking, as required by her release conditions. Since her release from her prior conviction, Ms. Baca has also continued to return to the night clubs she previously visited when looking for commercial sex clients. This shows an unwillingness to comply with release conditions, which offsets the positive aspects of her history and characteristics and makes this factor neutral.

### E. Nature and Seriousness of the Danger to Any Person or the Community

Ms. Baca's release poses two primary risks to the community. First, there is the risk that Ms. Baca would continue to engage in human trafficking by force, fraud, or coercion. During the detention hearing, the government proffered that Ms. Baca has continued to return to the nightclubs where she previously solicited clients for commercial sex. However, the government further stated that it has no evidence that Ms. Baca has continued to engage in commercial sex herself, or recruit others to do so. Additionally, the government did not proffer evidence that Ms. Baca engaged in any human trafficking since Mr. Armstead's incarceration. Thus, the undersigned finds that release conditions, to include home detention through the High Intensity Supervision Program, would mitigate this first risk.

The second risk is that Ms. Baca would continue to engage in unlawful and dangerous conduct at Mr. Armstead's request, and the undersigned finds that no release conditions would sufficiently mitigate this risk to reasonably assure the safety of the community. Specifically, the government alleges that since Mr. Armstead's incarceration, Ms. Baca has obstructed or attempted to obstruct justice regarding the trafficking charges against Mr. Armstead, and has

17

moved firearms for Mr. Armstead to prevent law enforcement from recovering illegal firearms. Notably, Ms. Baca allegedly acted on Mr. Armstead's behalf in these ways despite being prohibited from contacting him pursuant to the conditions of her post-conviction release. The government's evidence suggests that Mr. Armstead has been trafficking women—and at least one minor—for commercial sex for years. He allegedly uses fear and violence to control the women. This conduct is dangerous to society, and any obstruction of the investigation into Mr. Armstead also presents a danger to society by potentially thwarting the prosecution of a dangerous person. The government also proffered that Mr. Armstead and Ms. Baca have spoken on the phone since his incarceration, and that Mr. Armstead continues to engage in unlawful obstruction. The Pretrial Services Agency in this jurisdiction does not have the capability of monitoring electronic communications. Due to Ms. Baca's alleged illegal conduct on Mr. Armstead's behalf since he has been in custody, her history of noncompliance with release conditions, and the fact that Pretrial Services would be unable to monitor her electronics were she to be released, the undersigned finds that no release conditions would sufficiently mitigate this second risk to the community, thus this factor also favors detention.

## Conclusion

For the foregoing reasons, the Court finds the United States has met its burden in showing by clear and convincing evidence that pretrial detention is warranted because Ms. Baca presents a danger to the community. Having reviewed and weighed all the evidence and the factors set forth in 18 U.S.C. § 3142(g), and after considering all of the less restrictive alternatives to pretrial detention, this Court concludes no condition or combination of conditions

would reasonably assure the safety of the community if Ms. Baca were released. Therefore, the Court GRANTS the United States' motion for detention without bond.

Dated:  September 26, 2019

ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE